# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **ROSARIA M. and JOHN M. individually and as parents and next friends of F.M., a minor,** | } } } } | |
| **Plaintiffs,** | } } | **Case No.: 5:16-cv-00586-MHH** |
| **v.** | } } | |
| **THE MADISON CITY BOARD OF EDUCATION** | } } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Rosaria M. and John M. bring this action on behalf of their daughter, F.M., a disabled student. The plaintiffs contend that the defendant, the Madison City Board of Education, denied F.M. the free appropriate public education guaranteed to her by the Individuals with Disabilities in Education Act (IDEA) 20 U.S.C. § 1400 *et seq.* The plaintiffs filed this action to appeal the decision of a hearing officer who determined that the school board did not deny F.M. a free and appropriate public education during the 2014-15 schoolyear. Both parties have asked the Court to enter judgment in their favor on the basis of the

1

record compiled during the administrative due process hearing.[1]  For the reasons explained below, the Court will enter judgment in favor of the defendant school board.

## I.      STATUTORY & FACTUAL BACKGROUND

The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living . . . ."  20 U.S.C. § 1400(d)(1)(A). The IDEA defines a free appropriate public education — i.e. a "FAPE" — as:

> special education and related services that —
>
> **(A)** have been provided at public expense, under public supervision and direction, and without charge;
>
> **(B)** meet the standards of the State educational agency;
>
> **(C)** include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> **(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

§§ 1401(9)(A)-(D).

---

[1] Although the parties style their filings as motions for summary judgment, the standard of review that the parties recite in their briefs reveals that both parties are seeking judgment on the record as opposed to traditional summary judgment under Federal Rule of Civil Procedure 56. (*See* Doc. 16-1, pp. 2-3; Doc. 17-1, pp. 18-19).

The IDEA contemplates that federal and state authorities will cooperate to provide disabled students with a FAPE. To that end, the federal government provides funding to state educational agencies, and the agencies agree to comply with the procedures and conditions imposed by the IDEA. *See generally* 20 U.S.C. §1412(a). The Madison City Board of Education is a state education agency that accepts federal funding and is covered by the provisions of the IDEA. (Doc. 8, p. 3).

Under the IDEA, state educational agencies must identify and evaluate students who qualify for the special education services mandated under the IDEA. 28 U.S.C. § 1412(a)(3)(A). When the state identifies a qualified student, the individualized education program (IEP) is the primary tool by which a state educational agency accomplishes its mandate to provide disabled students with an appropriately tailored education. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP is a written document that a public school produces in collaboration with a student's parents or guardians, the student's general and special education teachers, and the representatives of the state educational agency collectively known as the IEP team. 20 U.S.C. § 1414(d)(B).

To ensure that the IEP team appropriately considers a student's particular challenges and needs when designing a plan, the IDEA states that an IEP must

contain certain information. An IEP must describe the student's disability and the disability's effect on the student's participation in the general education curriculum, the student's present levels of achievement, the goals the student is to reach under the IEP program, and additional services that the school will provide to aid the student in achieving those goals. *See* §§ 1414(d)(1)(A)(i)(I)-(III). The IEP team must meet at least annually to review the program, to verify the program's effectiveness, and to ensure that it remains responsive to the student's changing educational needs. § 1414(d)(4)(A)(i).

"Parents and educators often agree about what a child's IEP should contain. But not always. When disagreement arises, parents may turn to dispute resolution procedures established by the IDEA." *Endrew F.*, 137 S. Ct. at 994. Parents who disagree with an aspect of their child's IEP may present their grievance to an impartial hearing officer at a due process hearing. § 1415(f)(1)(A). If either party disagrees with the outcome of the due process hearing, then they may seek review of that decision by filing a civil action in "any State court of competent jurisdiction or in a district court of the United States . . . ." § 1415(i)(2)(A).

Plaintiffs Rosaria M. and John M. are parents of a disabled child who have exercised the due process and appeal rights that the IDEA provides. Their daughter, F.M., is a ten-year-old child with a specific learning disability. (Doc. 13-

18, pp. 16, 30). Ms. M. states that F.M. has ADHD and dyslexia. (Doc. 13-9, pp. 5, 115).

In the fall of 2014, plaintiffs moved their family from Pennsylvania to Madison City, Alabama. They enrolled F.M. and her older sister at Mill Creek Elementary on October 14, 2014. (Doc. 13-9, pp. 10-11, 33). F.M. had completed preschool and kindergarten in Pennsylvania. (Doc. 13-9, pp. 11, 18-19). She also had attended roughly a month of first grade before her family moved and enrolled her in first grade at Mill Creek. (Doc. 13-9, p. 27). While the family was still in the Pennsylvania school system, the school district evaluated F.M.'s older sister and determined that she was eligible for special education. (Doc. 13-9, pp. 28-29). Based on the feedback that Ms. M. received from F.M.'s teachers in Pennsylvania, Ms. M. suspected that F.M. also might be eligible for special education services. (Doc. 13-9, pp. 29-33). She approached F.M.'s first grade teacher and the principal at Mill Creek, and she expressed interest in having F.M. evaluated. She made a formal written request for an evaluation on November 4, 2014. (Doc. 13-9, pp. 35-36, 40-41; Doc. 13-17, pp. 55).

Before Ms. M. submitted her written request, F.M.'s first grade teacher, Rebecca Davis, noticed that F.M. had behavioral and academic issues in the classroom. F.M.'s initial assessments put her well below her first grade classmates in terms of her academic ability. (Doc. 13-3, pp. 31, 45). F.M. was unable to

remain still or attentive during class, and Ms. Davis found that F.M. needed frequent redirection to complete even basic tasks.  (Doc. 13-3, pp. 41; 45).  Due to these concerns, Ms. Davis met with Ms. M. and assistant principal Kathleen McKay to suggest that F.M. be enrolled in kindergarten for the year.  (Doc. 13-3, p. 7).  Ms. M. requested that F.M. remain in first grade.  (Doc. 13-3, p. 35).  Mill Creek honored that request and offered F.M. some general educational supports including tutoring three days a week and classes in English-as-a-second language (ESL), because the school mistakenly believed that Ms. M. spoke a foreign language with her daughters.  (Doc. 13-3, pp. 36-38; Doc. 13-9, pp. 36-37).  Ms. Davis referred her concerns regarding F.M. to Mill Creek's "Problem Solving Team," so that she (Ms. Davis) could develop strategies for responding to F.M.'s classroom issues.  (Doc. 13-3, p. 152).  Ms. Davis permitted Ms. M. to observe F.M.'s class on several occasions and communicated with Ms. M. regularly.  (Doc. 13-3, pp. 39-40, 68, 89; Doc. 13-9, pp. 141-42).

After the school received Ms. M's written request for an evaluation, the school board's special education eligibility team assessed F.M. in the areas of hearing, speech/language, academic achievement, behavior, and environmental concerns.  (Doc. 13-5, p. 205; Doc. 13-6, p. 21; Doc. 13-18, pp. 16-22, 25-26).  The eligibility team also considered F.M.'s medical records, obtained from treating physicians near the family's former home, and observational information from

F.M.'s parents and Ms. Davis. (Doc. 13-18, pp. 26-28). On January 16, 2015, the eligibility team determined that F.M. had a specific learning disability and that she was eligible for special education services. (Doc. 13-18, p. 30).[2]

On February 6, 2015, the Board conducted an IEP meeting. The plaintiffs met with Ms. Davis; Assistant Principal McKay; Mill Creek's special education teacher, Alicia Waddail; and F.M.'s ESL teacher, Michelle Phillips, to design an educational program that would assist F.M. in her areas of difficulty. (Doc. 13-14, p. 21). At this IEP meeting, Ms. M. claims that she informed the other members of the IEP team that F.M. suffered from hypoglycemia and Multiple Hereditary Exostoses (MHE), also called Osteochondroma, a condition that causes the rapid growth of benign tumors on F.M.'s bones. (Doc. 13-9, pp. 4-5, 44-45). Although F.M.'s teachers were aware of F.M.'s diagnosis, both Ms. Davis and Ms. Waddail testified that they became aware of the diagnosis after the initial IEP meeting. (Doc. 13-3, pp. 189-90; Doc. 13-4, pp. 155-56).

---

[2] A "specific learning disability," is a classification that qualifies the affected student for special education services. A "specific learning disability" is defined as:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, of emotional disability, or of environmental, cultural, or economic disadvantage.

Ala. Admin. Code 290-8-9-.03(10)(a).

Based on the information discussed in the IEP meeting, the IEP team targeted four areas for improvement: articulation, behavior, math, and fluency. (Doc. 13-14, pp. 16-19). Under her IEP, F.M. received several hours of special instruction from Ms. Waddail each week to focus on basic kindergarten and first grade skills. Ms. Waddail and F.M. also used this time to complete any assignments that F.M. was unable to finish in class. (Doc. 13-4, pp. 45-47; Doc 13-14, p. 20).

By early April 2015, Ms. Davis informed the plaintiffs that F.M. would likely have to remain in the first grade because F.M. did not meet the state's general education standards for advancement to the second grade in the areas of reading and math. (Doc. 13-2, pp. 118, 230-31; Doc. 13-18, pp. 11-13). In May, Mill Creek's retention committee discussed F.M.'s case, reviewed her test results and Ms. Davis's input, and determined that F.M. would return to the first grade for the 2015-16 academic year. (Doc. 13-2, pp. 77, 108-109). The consensus of F.M.'s teachers was that "if she had another year in the 1st grade to receive those foundational skills that it would set her up for success." (Doc. 13-2, p. 139).

Ms. Davis and Assistant Principal McKay informed the plaintiffs of the committee's decision at a conference on May 14, 2015. (Doc. 13-3, pp. 113-14). The plaintiffs did not agree with the decision and expressed their concern that retaining F.M. in the first grade would cause her emotional or psychological harm;

they reported that F.M. already suffered from low self-esteem caused by the prospect of retention. (Doc. 13-9, pp. 110, 141). The plaintiffs contend that after they learned that F.M. would have to repeat first grade, they asked Mill Creek to provide F.M. with extended year services (ESY) and that the school denied their request. (Doc. 13-9, pp. 70-71). The teachers and administrators at Mill Creek who spoke with the plaintiffs dispute this fact, claiming that the conversation focused on what the plaintiffs could do to see that F.M. was promoted to second grade. (Doc. 13-3, pp. 115, 119-20, 252). The parties agree that the plaintiffs requested instructional materials, so that they could tutor F.M. in hopes that she could test into the second grade before the start of the 2015-16 academic year. (Doc. 13-3, p. 115; Doc. 13-9, p. 110).

Ms. Davis and Ms. Waddail provided some supplementary materials for the plaintiffs to use with F.M. during the summer. (Doc. 13-9, pp. 112-113). Ms. M. worked through these materials with F.M. during the summer, and the school board reassessed F.M.'s readiness for second grade after her summer preparations. (Doc. 13-9, pp. 114, 117). F.M.'s scores indicated that she was not prepared for second grade, and the school board determined that the decision to retain F.M. in the first grade was sound. (Doc. 13-9, pp. 134-36).

When F.M. returned to Mill Creek in August 2015, she was assigned to Celynn Ballard's class, but she continued to work with Ms. Waddail in special

education. Ms. Ballard noted that in the early weeks of the new school year, F.M. was having more success completing her assignments during class and that F.M.'s behavior and attentiveness generally had improved. (Doc. 13-6, pp. 72-74, 101-102). F.M. left Mill Creek in late September 2015 to undergo a medical procedure related to her MHE. (Doc. 13-9, pp. 151-52 ). When she recovered, the plaintiffs removed her from Mill Creek and enrolled her in an online educational program. (Doc. 13-9, p. 154).

The plaintiffs filed their due process complaint on September 14, 2015. (Doc. 13-12, p. 16). The defendants argue that the school board failed to comprehensively evaluate F.M. in all suspected areas of disability and that her IEP was not reasonably calculated to provide her with a FAPE. (Doc. 13-1, pp. 2-3). Over nine days, the hearing officer heard extensive testimony and compiled a substantial evidentiary record. (Doc. 13-1, pp. 4-6). The hearing officer rendered a decision in the school board's favor on all the plaintiffs' claims and concluded that the school board had not denied F.M. a FAPE during the 2014-15 schoolyear. (Doc. 13-1, p. 55-61). The plaintiffs filed this civil action on April 11, 2016. (Doc. 1).

These facts suffice as background to the case, but the Court offers additional facts below as they bear on the legal analysis.

## II. STANDARD OF REVIEW

Any party to a due process hearing aggrieved by the hearing officer's decision may seek review of that decision by filing a civil action "in a district court of the United States." *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008) (quoting 20 U.S.C. § 1415(i)(2)(A)). "[T]he party attacking the IEP bears the burden of showing that the IEP is inappropriate." *Devine v. Indian River Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001); *see also* Ala. Admin. Code 290-8-9-.08(9)(c).

The Supreme Court has formulated a two-part test to determine whether a school has provided a student with a FAPE: "[f]irst, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. Ed. Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982). Whether an educational program provided an adequate education under the Act "is a mixed question of law and fact." *CP v. Leon Cty. Sch. Bd. Fla.*, 483 F.3d 1151, 1155 (11th Cir. 2007).

"The usual F.R. Civ. P. 56 summary judgment principles do not apply in an IDEA case." *Loren F ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003). "A District Court may issue a judgment on the record based 'on the preponderance of the evidence,' . . . even when facts are in dispute." *R.L.*

*v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). A district court may accept the conclusions of the hearing officer that are supported by the record and reject those that are not. *R.L.*, 757 F.3d at 1178. "[A]dministrative factfindings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *M.M. ex rel. C.M. v. Sch. Bd. Miami-Dade Cty.*, 437 F.3d 1085, 1097 (11th Cir. 2006) (quoting *Loren F.*, 349 F.3d at 1314 n.5).

## III. DISCUSSION

The plaintiffs argue that the defendant committed both procedural and substantive violations of the IDEA. The Court, adhering to the two part test announced in *Rowley*, first addresses plaintiffs' allegations of procedural deficiencies. Then the Court addresses the plaintiffs' additional reasons for arguing that F.M.'s IEP was not reasonably calculated to provide a FAPE.

### a. The Adequacy of the School Board's Evaluation of F.M.

The plaintiffs contend that the school board's evaluation of F.M. was procedurally deficient because the school board did not comprehensively evaluate F.M. in all suspected areas of disability. The plaintiffs argue that (i) the board did not conduct a formal behavioral assessment of F.M., and (ii) the evaluation that the school performed focused too narrowly on F.M.'s academic issues to the exclusion of behavioral and medical concerns. (Doc. 17, p. 22). The plaintiffs submit that,

"[w]ithout a full and complete evaluation, it was impossible for a School District to meet its FAPE responsibility." (Doc. 17, p. 24). The plaintiffs also argue that the school board unreasonably delayed an evaluation of F.M. for eligible disabilities. (Doc. 19, p. 12).

Under the IDEA, a state must ensure that "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). When a school board, as an agent of the state, identifies a student who exhibits signs of a covered disability, the school board must evaluate the student "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities . . . ." 34 C.F.R. 300.304(c)(4). The school's evaluation of the student must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. 300.304(c)(6).

## 1. The School Board's Assessment of F.M.'s Behavioral Issues

The hearing officer in this case noted that plaintiffs' allegations implicated the school board's "child find" duty, the statutory responsibility to identify and

evaluate students who may qualify for special education services. 20 U.S.C. § 1412(a)(3)(A); (Doc. 13-1, p. 37). The hearing officer determined that the school referred F.M. for an evaluation within a reasonable amount of time, less than a month after she transfered to Mill Creek. (Doc. 13-1, p. 38). The hearing officer also determined that the school board adequately evaluated F.M.'s academic and behavioral issues and complied with state regulations governing the evaluation of students. (Doc. 13-1, p. 39). The hearing officer noted that the school had adequately considered F.M.'s MHE diagnosis, and he determined that the school did not have to evaluate F.M. for ADD/ADHD because F.M. had no such diagnosis. (Doc. 13-1, p. 40). [3]

The plaintiffs challenge the hearing officer's conclusions. With respect to F.M.'s behavioral issues, the plaintiffs contend that the school board did not adequately explore the nature and extent of F.M.'s behavioral issues because the school did not conduct a functional behavioral analysis (FBA). (Doc. 17-1, p. 27). The plaintiffs also contend that, given F.M.'s classroom behaviors, the school should have evaluated F.M. for ADD/ADHD and considered the behavioral

---

[3] Although parties to a due process hearing may ask the court to consider additional evidence, here both parties rely on the briefs submitted to the Court and the record compiled during the due process hearing. (Doc. 16, pp. 2-3; Doc. 17, p. 2). Although Ms. M. testified at the hearing that F.M. suffers from both ADHD and dyslexia, the Court has not found evidence in the record documenting these assertions, though the record contains evidence of F.M.'s other known impairments. The plaintiffs also do not argue in their briefs that F.M. actually suffered from either ADHD or dyslexia, though they do allege that the school board ought to have evaluated F.M. for these conditions.

consequences of F.M.'s MHE diagnosis. (Doc. 17-1, p. 23). The defendants argue that an FBA was not required in F.M.'s case and that the school adequately considered the ways in which F.M.'s behavioral issues might affect her academic progress. (Doc. 16-1, pp. 33-35).

A school board must conduct a comprehensive evaluation of a special-needs student "in all areas related to the suspected disability." 34 C.F.R. 300.304(c); (*see* p. 13 above); *see also* Ala. Admin. Code 290-8-9-.02(1)(t) ("In evaluating each child with a disability, the evaluation must be sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been identified."). Consistent with this duty, the Eleventh Circuit has held that a school must evaluate a student for all suspected disabilities if the information that a school has concerning the student gives the school notice of an underlying disability. *See Phyllene W. v. Huntsville City Bd. Educ.*, 630 Fed. Appx. 917, 924–25 (11th Cir. 2015).

Here, F.M.'s first grade teacher, Ms. Davis, noticed F.M.'s consistent behavioral issues in the classroom before F.M. was evaluated. (Doc. 13-14, p. 14; Doc. 13-18, p. 2). When the plaintiffs gave their input as part of the IEP design process, they cited concerns that F.M. always wanted to be right and that she was easily upset, frequently distracted, and often forgot instructions. (Doc. 13-14, p.

13).  The school board's evaluation indicated that hyperactivity was a concern for F.M.  (Doc. 13-15, p. 51).  Where a student consistently demonstrates behavioral issues in her classroom environment, the IDEA states that the student's IEP team must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(3)(B)(i).  Where, as here, the school does not perform an FBA, the Court must "take particular care to ensure that the IEP adequately addresses the child's problem behaviors."  *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013).

The hearing officer erred when he determined that the school did not have to evaluate F.M. for ADHD in the absence of a formal diagnosis.  (Doc. 13-1, p. 40).  The sweeping language in both state and federal regulations contradicts this conclusion.  *See* 34 C.F.R. 300.304(c); Ala. Admin. Code 290-8-9-.02(1)(t).  *Cupertino Union Sch. Dist. v. K.A.*, the decision on which the hearing officer relied, does not suggest otherwise.  2014 WL 7272874 (N.D. Cal. Dec. 22, 2014).  There, state law made a formal diagnosis a prerequisite for in-home instruction of a public school student.  2014 WL 7272874, at *2.  When K.A.'s parents failed to obtain a diagnosis confirming that K.A. could not function in a less restrictive environment, the IEP team did not offer in-home instruction.  2014 WL 7272874, at *2.  The district court held that Cupertino Union did not violate the IDEA by denying K.A. in-home instruction because the parents did not satisfy the state law

prerequisites for home instruction. 2014 WL 7272874, at *4. Alabama law does not require parents to obtain a formal diagnosis before a school district, consistent with the IDEA, evaluates a student for all suspected disabilities. "The salient question here is whether the Board was on notice that the circumstances warranted []evaluation." *Phyllene W.*, 630 Fed. Appx. at 924.

The hearing officer's error does not settle the question of the adequacy of the school's evaluation of F.M. The Court first must consider whether the school's failure to conduct an FBA warrants relief. A school's failure to conduct an FBA "may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all." This concern has lead some courts to conclude that the failure to conduct an FBA amounts to a procedural violation of the IDEA. *See, e.g.*, *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). But even if the failure to conduct and FBA is a procedural violation, a "[v]iolation of any of the procedures of the IDEA is not a per se violation of the Act." *K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.*, 741 F.3d 1195, 1205 (11th Cir. 2013). Even when a school board does not conduct an FBA, the board nonetheless may provide the student with a FAPE during the period governed by the IEP if the program that the IEP team designs adequately addresses the student's needs and prepares the student for further education. *See M.W.*, 725 F.3d at 141; *R.E.*, 694 F.3d at 193.

For a student with known behavioral issues, an IEP is not legally inadequate if the IEP "adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *M.W.*, 725 F.3d at 140. In *M.W.*, the school board did not conduct an FBA before developing an IEP for a student whom the school knew was autistic. Despite the absence of an FBA, the student's IEP included a behavior intervention plan that "noted (1) the student's attention problems; (2) the student's need for a personal aide to help the student focus during class; and (3) the student's need for psychiatric and psychological services." *M.W.*, 725 F.3d at 140. The Second Circuit Court of Appeals determined that, in light of the accurate behavioral concerns addressed by the IEP, the absence of an FBA did not deny the student a FAPE. *M.W.*, 725 F.3d at 141.

Here, the board did not conduct an FBA, but the record indicates that the board did evaluate F.M. in several behavioral areas, using input from her teacher and her parents. (Doc. 13-1, p. 39; Doc. 13-15, pp. 49-51). The school board argues that F.M.'s IEP included a behavioral intervention plan (BIP) designed to address her most persistent behavioral problems. (Doc. 16-1, p. 15). The plaintiffs dispute this contention and argue that the so-called "BIP" was just a series of ad-hoc attempts by Ms. Davis to address F.M.'s classroom behaviors before F.M. was evaluated. (Doc. 19, p. 2). There is enough evidence in the administrative record to support a finding that the IEP team created and implemented a plan to address

F.M.'s most problematic behaviors as the problems relate to F.M.'s academic development.

F.M.'s IEP indicates that Mill Creek designated her as a student covered by a BIP. (Doc. 13-14, p.15). The IEP team recognized F.M.'s behavior as a distinct area of concern because her "difficulties staying on-task and following directions interfere with her ability to complete work as well as her ability to acquire and retain new skills." (Doc. 13-14, p. 17). To address the behavioral concerns, the IEP sets aside 60 minutes of instruction weekly devoted to the achievement of behavior-specific goals. (Doc. 13-14, p. 20). Appended to F.M.'s IEP is a "Functional Assessment Summary and Behavioral Intervention Plan" that identifies as "target behaviors" F.M.'s difficulty following directions and completing tasks. (Doc. 13-14, p. 22). The BIP explains why F.M. uses the target behaviors, indicates desired replacement behaviors, suggests teaching strategies to that end, and sets behavioral benchmarks for assessing F.M.'s progress. (Doc. 13-14, pp. 22-23). Elsewhere in the IEP, notations indicate that, in view of F.M.'s demonstrated classroom difficulties, Mill Creek will provide F.M. with testing accommodations, preferential seating, frequent in-class breaks, and extended time to complete tasks. (Doc. 13-14, p. 20).

Testimony given during the due process hearing indicates that F.M.'s teachers at Mill Creek implemented this program of behavioral intervention during

the 2014-15 schoolyear. Before the IEP team created F.M.'s IEP, F.M.'s first grade teacher, Ms. Davis, used a number of strategies to address behaviors that impeded F.M.'s classwork. (Doc. 13-18, p. 4). When F.M.'s IEP was in place, Ms. Davis implemented several of the interventions identified in that program: she gave F.M. verbal and non-verbal cues to stay on task, she sat F.M. close to her in class and in small group sessions, she limited or removed distractions in F.M.'s workspace, she had F.M. repeat directions, she allowed F.M. to take frequent breaks from work, and she rewarded F.M. with free-time when F.M. behaved as desired. (Doc. 13-3, pp. 41, 63-65, 70-72, 77-78).

Additionally, Mill Creek's special education teacher, Ms. Waddail, provided F.M. with "pull-out" services twice a week for 30 minutes. During these sessions F.M. received instruction in a small group setting or was supervised directly by Ms. Waddail as she completed her class assignments. (Doc. 13-4, pp. 45-47, 52-53). Ms. Waddail also worked with F.M. to help F.M. develop positive behaviors, and Ms. Waddail implemented a system of rewards for desired behavior as contemplated by F.M.'s IEP. (Doc. 13-4, pp. 48, 51-52). Once a week, Ms. Waddail would visit and work with F.M. in her general first grade classroom. (Doc. 13-4, pp. 46-47). The testimony of both Ms. Davis and Ms. Waddail indicates that they regularly kept one another informed of F.M.'s behavior, the

strategies to which F.M. responded, and the work that F.M. needed to complete. (Doc. 13-3, p. 174; Doc. 13-4, pp. 47-49).

The record does not establish that Mill Creek implemented F.M.'s BIP to the fullest possible extent. Ms. Davis and Ms. Waddail appear to have conflated the need to collect data on F.M's behaviors, as contemplated in the IEP, with simply saving F.M.'s completed assignments. (Doc. 13-3, pp. 57, 179; Doc. 13-4, pp. 58-59). Had F.M.'s teachers recorded more information on the fluctuations in her ability to follow directions or to finish her classwork, the record might provide a clearer picture for review. Still the Court is aware that assessments of behavior are more subjective than are assessments of other areas of concern, such as reading and mathematics. The Court also is mindful that it may not review a school's efforts against an "ideal-in-hindsight" standard. *See Endrew F.*, 137 S. Ct. at 1002 ("Th[e] absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'") (quoting *Rowley*, 458 U.S. at 206)).

The behavioral intervention strategies that Mill Creek identified seem to be both individualized and targeted to F.M's areas of difficulty, as her teachers and parents perceived them. The record indicates that F.M.'s teachers made a conscientious effort to implement the behavioral aspects of the IEP. For these

reasons, the Court concludes that the school board's evaluation of F.M.'s behavior was not inadequate and that Mill Creek implemented positive behavioral interventions responsive to F.M.'s needs.

### 2. The School Board's Evaluation of Non-Behavioral Concerns

The plaintiffs contend that the school board's evaluation was insufficient because the school board did not account for F.M.'s MHE and hypoglycemia diagnoses, and the board did not assess F.M.'s suitability for occupational therapy. (Doc. 17-1, p. 25-26). Plaintiffs argue that F.M.'s MHE caused some of her difficulties participating fully in class. (Doc. 17-1, p. 25). Here, again, the Court finds that although the school board potentially could have done more, the record supports the hearing officer's conclusion that the school board did not commit errors that effectively denied F.M. a FAPE.

### A. MHE

In addition to assessing F.M. in the areas of behavior and academics, the school expressly considered F.M.'s MHE "osteochondromas" diagnosis. (Doc. 13-15, p. 47; Doc. 13-18, p. 27). Tricia Daniel-Madden, the school board's psychologist, assessed F.M. as part of F.M.'s special education eligibility determination. She testified that the IEP team obtained F.M.'s medical records documenting F.M.'s MHE diagnosis, and that she (Ms. Daniel-Madden) researched

the condition to determine whether it might have an impact on F.M.'s academic performance.  (Doc. 13-6, pp. 39-41).  Although the eligibility team was aware of F.M.'s MHE diagnosis, the team felt that MHE was not the primary cause of F.M.'s issues and that a learning disability was more consistent with F.M.'s test results and the information provided in her evaluation referral.  (Doc. 13-6, pp. 19-20, 30-31).  Ms. Waddail testified that she was aware of F.M.'s MHE and that the condition was mentioned in the file that the school board compiled after the evaluation.  (Doc. 13-4, pp. 155-56).  Ms. Waddail testified that she knew from her own research that MHE could be associated with chronic fatigue, but she indicated that the plaintiffs had provided little information to the IEP team on the subject. (Doc. 13-4, pp. 156-58).

Plaintiffs contend that this limited assessment of F.M.'s MHE does not address the issues associated with the diagnosis.  The plaintiffs argue that children diagnosed with MHE exhibit a suite of behavioral issues including "high distractibility, inability to maintain focus, and learning issues."  (Doc. 17-1, p. 2). There seems to be little disagreement that F.M. exhibited all of these behaviors to some degree, but it is not clear that the underlying cause was her MHE.

Regardless of whether F.M.'s MHE was the cause, the behavioral issues that MHE can cause are the same behaviors that the IEP team included in its assessment, based on input from the plaintiffs and Ms. Davis.  (Doc. 13-18, p. 16;

Doc. 13-22, pp. 48-50). Plaintiffs have not explained why the interventions targeting these behaviors were any less effective because there was a possible alternative cause for them. Ms. Daniel-Madden testified that even if the eligibility team had determined that F.M.'s learning issues were grounded in something other than a learning disability, the strategies used to respond to F.M.'s behavior would not have been substantially different because F.M.'s IEP already accounted for her known behavioral concerns. (Doc. 13-6, pp. 56-57). In the absence of evidence explaining why an MHE diagnosis requires additional or alternative behavioral strategies, the Court cannot conclude that the IEP's behavioral interventions were inadequate.

The plaintiffs posit that the IEP is inadequate because it does not account for F.M.'s anticipated absences due to her MHE. (Doc. 17-1, pp. 25-26). Ms. M. claims that she made the IEP team aware that F.M. would be absent frequently due to the surgeries required to remove F.M.'s benign bone tumors. (Doc. 13-9, p. 57-58). Ms. M. also alleges that she frequently requested that Ms. Davis or Ms. Waddail provide F.M. with homework, but that the teachers seldom responded to her requests. (Doc. 13-9, pp. 58, 61-62; Doc. 13-14, pp. 36-37).

The evaluation referral form did not flag potential absences as a factor for consideration, although the form does contain some other background medical information. (Doc. 13-18, p. 18). The evaluation references several surgeries, but

it appears to reference them as past interventions to help F.M. rather than as prospective concerns.  (Doc. 13-18, p. 27).  Speaking for the eligibility team, Ms. Daniel-Madden testified that they "look[ed] at [F.M.'s] grade and attendance from the time she had entered our school system until we met for the referral . . . ." (Doc. 13-5, p. 206)  At the time of the eligibility referral, F.M. had been absent from Mill Creek only once.  (Doc. 13-18, p. 7).  As for the plaintiffs' contention about homework, Ms. Waddail testified that she "sent work home based on [F.M.'s] IEP goals" when F.M. "was out of school for medical reasons."  (Doc. 13-5, p. 25).  Ms. Davis commented that, when F.M. was considered at risk for retention, she "provided tons of stuff for her to take home."  (Doc. 13-3, p. 89).

F.M.'s attendance profile for 2014-15 indicates that she was absent a total of twelve days.  (Doc. 13-18, pp. 7-8).  Nine of these entries state that the reason for her absence was a doctor's note.  (Doc. 13-18, pp. 7-8).  But the attendance profile does not indicate, and the plaintiffs do not explain, which of these absences were caused by F.M.'s MHE.  At some point, the failure to address consistent absences for medical reasons would constitute denial of a FAPE, if the school did not otherwise compensate the student for lost time.  But on the record in this case, the Court cannot conclude that all of F.M.'s absences were due to her MHE.  Even if plaintiffs could attribute all absences to F.M.'s MHE, the plaintiffs do not explain why nine or twelve absences in the course of a school year denied F.M. a FAPE.

Given the paucity of evidence regarding the reasons for F.M.'s absences and the conflicting evidence regarding the extent to which Mill Creek provided homework for F.M. during her absences, the Court must defer to the hearing officer's conclusion that Mill Creek did not deprive F.M. of an academic benefit during these absences. (Doc. 13-1, pp. 59-60).

Although F.M. did miss significant amounts of school in September and October of 2015 due to an MHE-related surgery, the Court notes that Mill Creek provided her with home-bound instruction services from October 1 until October 30, 2015, roughly the time during which the plaintiffs enrolled F.M. in online education. (Doc. 13-14, pp. 57-58).

## B. Occupational Therapy

The administrative record does not clearly indicate that occupational therapy was an issue that seriously affected F.M.'s academic progress. (Doc. 13-6, pp. 51-52, 62-63). The plaintiffs contend that a referral for occupational therapy was Ms. Davis's idea based on her observations of F.M.'s handwriting issues, F.M.'s tendency to chew erasers, and F.M.'s tendency to play with her clothing. (Doc. 17-1, p. 6).

Dr. Kilgore, the school board's Director of Special Education, testified that the IEP referral contained little to indicate that F.M. was suffering from motor

deficiency. (Doc. 13-10, pp. 139-40). The hearing officer agreed with this statement. (Doc. 13-1, p. 40). The evaluation form indicates that the eligibility team considered and ruled out a motor deficiency, though the team did not conduct a full scale evaluation. (Doc. 13-18, p. 9).

Under the IDEA, if the school board had notice of behaviors suggesting that F.M. suffered from a motor deficiency, then the board had a duty to evaluate the deficiency. *See Phyllene W.*, 630 Fed. Appx. at 924–25. Assuming that F.M.'s handwriting issues and her tendencies to chew erasers and to play with her clothes and papers indicated a possible motor deficiency, the failure to conduct an evaluation specific to occupational therapy does not conclusively establish an IDEA violation. The FAPE concept is premised on an educational plan that is responsive to a student's demonstrated needs. When an IEP addresses those needs, the educational significance in precisely classifying each of a student's possible disabilities diminishes. *See M.M. ex rel. C.M. v. Sch. Bd. Of Miami-Dade Cty. Fla.*, 437 F.3d 1085, 1095 (11th Cir. 2017) (citing 34 C.F.R. § 300.300(a)(3)(ii)).

F.M.'s handwriting apparently was a temporary problem. (Doc. 13-4, p. 68; Doc. 13-9, pp. 119-120). Ms. Waddail noticed some transient issues with F.M.'s handwriting, but that the issues began shortly before F.M. underwent surgery and stopped when F.M. returned to school. (Doc. 13-4, pp. 29-30). The record indicates that F.M's classroom habit of chewing erasers resolved itself during the

schoolyear.  (Doc. 13-4, pp. 20-21; Doc. 13-6, p. 77).  And the plaintiffs do not explain how F.M.'s tendency to play with her papers and clothes was something other than a manifestation of her inability to maintain focus, an issue considered by F.M.'s IEP team and addressed in her plan.  Therefore, the Court rejects the plaintiffs' contention that the failure to conduct a full motor skills evaluation denied F.M. a FAPE.

### C. Hypoglycemia

Plaintiffs make a cursory allegation that the IEP did not account for the effects of F.M.'s hypoglycemia. The allegation finds no support in the administrative record.  The eligibility committee learned about F.M.'s hypoglycemia when the committee obtained F.M.'s medical records from her treating physicians.  (Doc. 13-18, p. 27).  Mill Creek established a health plan to address the effects that the condition could have on F.M.'s school performance. (Doc. 13-22, pp. 53-55).  Both Ms. Davis and Ms. Waddail were aware of F.M.'s hypoglycemia.  (Doc. 13-3, p. 189).  Ms. Davis knew that F.M. needed her blood sugar checked if F.M. exhibited symptoms, and Ms. Davis and Ms. Waddail allowed F.M. to have snacks during class to maintain her blood sugar levels.  (Doc. 13-3, p. 189).  Mill Creek also permitted Ms. M. to visit school almost daily to ensure that F.M. consumed enough of her lunch to avoid the most serious symptoms of hypoglycemia.  (Doc. 13-3, p. 68; Doc. 13-22, p. 53).  The record

does not support a finding that Mill Creek allowed F.M.'s hypoglycemia to interfere with her education.

### 3. Whether the School Board Considered F.M.'s Eligibility for Extended Schoolyear Services

The plaintiffs argue that the school board did not consider F.M.'s need for extended schoolyear services (ESY). (Doc. 17-1, p. 40). The school board did not offer the services to F.M. even after the retention committee determined that she would remain in the first grade. The hearing officer determined that F.M. "was not improperly denied extended school year services," because "the consensus of the IEP team was that such services were not warranted." (Doc. 13-1, p. 60). The hearing officer also determined that any potential procedural violation relating to the failure to convene the IEP team after the retention decision was "de minimis." (Doc. 13-1, pp. 60-61). The record supports these conclusions.

A state education agency receiving federal funds under the IDEA "must ensure that extended school year services are available as necessary to provide FAPE. . . ." 34 C.F.R. § 300.106(a)(1). "Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child." 34 C.F.R. §300.106(a)(2); *see also* Ala. Admin. Code § 290-8-9-05(9)(b). "One criteria that may be considered by the

child's IEP Team is if significant regression, caused by an interruption in educational services, renders it unlikely that the child will regain critical skills even after an appropriate recoupment period." Ala. Admin. Code § 290-8-9-05(9)(b).

The parties dispute whether F.M.'s IEP team actually considered her eligibility for ESY. The plaintiffs argue that Ms. M. frequently spoke with teachers and administrators at Mill Creek about her interest in obtaining ESY services for F.M. (Doc. 13-9, pp. 68-71, 89-90). The plaintiffs also contend that F.M.'s eligibility for ESY was not discussed at the IEP's team's only meeting on February 6, 2015. (13-9, p. 68). Plaintiffs argue that the school unilaterally denied F.M. access to ESY services, and thus, the decision was not reached by F.M.'s IEP team as required by federal and state regulations.

The school board contends that the availability of ESY was discussed at the February IEP meeting, that F.M.'s eligibility for these services was discussed with the plaintiffs at that time, and that the available data supported the conclusion that F.M. did not need ESY services because there was no evidence that she was regressing after breaks in the school year. (Doc. 16-1, pp. 13, 19-20). The school board also argues that any subsequent requests by Ms. M were simply inquiries into the availability of a summer tutor, not a request for special education services during the summer break. (Doc. 16-1, p. 20).

The IEP document from the February 6, 2015 meeting indicates that the IEP team, including the plaintiffs, "considered the need for extended school year services." (Doc. 13-14, p. 21). The extent to which the IEP discussed this determination or the reasons for it is not entirely clear. Ms. M. contends that no such discussion occurred at the IEP meeting. (Doc. 13-9, p. 68). Ms. Davis's recollection of the February IEP meeting at least partially contradicts Ms. M.'s assertion. Ms. Davis stated that the IEP team discussed the availability of ESY services and that the IEP team felt that F.M. did not need these services because F.M. had not shown regression after the winter break. (Doc. 13-3, pp. 116-19). Ms. Waddail recalls the IEP team discussing the availability of ESY and recalls Ms. Davis giving her input to the IEP team on why summer services were not necessary. (Doc. 13-5, pp. 13-14). Assistant principal McKay testified that she could not recall the extent of the ESY discussion, but she noted that a particular student's eligibility for ESY usually would not be discussed at the first meeting for an initial IEP, like F.M.'s. (Doc. 13-3, pp. 224-47).

The hearing officer determined that ESY "services were discussed at Petitioner's [sic] initial IEP meeting but were rejected because there was no data to support the need for such services." (Doc. 13-1, p. 52). The statement indicates that the hearing officer credited the testimony of Ms. Waddail and Ms. Davis that

F.M.'s eligibility was discussed and rejected because she had not regressed during the winter break.

The hearing officer's resolution of the disputed fact is based in part on his assessment of the credibility of the witnesses who appeared at the due process hearing. On review, the Court is without the benefit of live testimony and therefore is not equally well-situated to make such an assessment. Consequently, the Court must defer to the hearing officer's finding because there is no substantial evidence that would warrant a finding that the hearing officer abused his discretion. *See D.K. v. Abington Sch. Dist.*, 696 F. 3d 233, 243 (3d Cir. 2012) (a district court "must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."); *see generally U.S. CFTC v. S. Trust Metals, Inc.*, 880 F.3d 1252, 1260 (11th Cir. 2018).

The IEP team did not have the opportunity to discuss F.M.'s potential for regression between the initial February meeting and the 2015 summer break because the IEP team did not meet again before the end of the 2014-15 schoolyear. (Doc. 13-4, p. 252). Federal and state regulations require only that the IEP team meet annually. 34 C.F.R. § 300.324(b)(1)(i); Ala. Admin. Code 290-8-9.05(11). As members of the IEP team, Ms. or Mr. M. could have called an IEP meeting if they wished to revisit the ESY issue; neither of them did so. *See* Ala. Admin.

Code 290-8-9.05(11)(3) ("If the parents or the child's teacher has reason to suspect that the IEP needs revision, an IEP meeting may be requested at anytime. The education agency must conduct the IEP meeting *within 30 calendar days* upon the receipt of the request.") (emphasis in original). Applying these rules, on this record, the Court is unable to say that the school board committed a procedural violation in its handling of F.M.'s eligibility for ESY for the summer of 2015, especially given the limited period of time that the board had to implement F.M.'s IEP before the 2015 summer break.[4]

Even if the Court were to assume that the school board failed to properly consider F.M.'s eligibility for ESY, to receive relief the plaintiffs still would have to prove that this violation affected the quality of F.M.'s education so greatly that it denied her a FAPE. To do so, the plaintiffs must point to facts that indicate that F.M. was eligible for ESY, and thus, the school board's failure to consider F.M.'s eligibility denied her a service to which she was entitled. The Eleventh Circuit has not expressly addressed this issue, but courts of appeal in several other circuits have concluded that a school district must provide ESY only when there is an indication that a student's probable regression during the summer "will substantially thwart the goal of meaningful progress." *M.M. v. Sch. Dist. of*

---

[4] This limited period of time arguably could support a presumption that F.M. should receive ESY, but the law dictates no such presumption, and the statutory procedures gave the plaintiffs tools which they could have used, but didn't, to formally request ESY for F.M.

*Greenville Cty.*, 303 F.3d 523, 538 (4th Cir. 2002) (internal quotations omitted); *see also Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 315 (6th Cir. 2007); *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir. 1986). The prospect that the student may regress somewhat over a break is not enough "because all students, disabled or not, may regress to some extent during lengthy breaks from school." *M.M.*, 303 F.3d at 538. The plaintiffs do not marshal sufficient evidence to meet the "probable regression" standard.

Although the plaintiffs make credible arguments that F.M.'s academic progress at Mill Creek was limited, they do not cite grades or assessments which indicate that she regressed academically following significant breaks from classroom instruction. Instead plaintiffs point to a notation made by Ms. Davis on F.M.'s April 2017 report card stating that "[a]lthough [F.M.] seems to grasp a skill one day, the next day or so she may lose the skill or require a lot of support to recall the skill." (Doc. 13-18, p. 15). The plaintiffs also argue that Ms. Davis's hearing testimony indicates that she was concerned that F.M. would regress after breaks in the school year. The Court is not persuaded.

While the Court does not doubt that the report card notation indicates a real concern that Ms. Davis had, standing alone, this statement does not establish that F.M. was entitled to ESY. Neither the comment nor its context makes clear what "skills" Ms. Davis is referring to, whether these are skills related to behavioral

control, to the general curriculum, or to F.M.'s IEP goals. If the notation is fairly construed to express a concern that F.M. experienced some regression, there is no evidence to suggest that her regression was linked to breaks in the school year or that the regression was so substantial that the lack of special education during the summer would cause F.M. to lose the educational benefit that she attained during the preceding school year.

In Ms. Davis's opinion, the summer break posed no such danger to F.M.'s progress. She noted that F.M. exhibited no signs of regression following the winter break. (Doc. 13-4, p. 180). Ms. Davis also did not observe regression after spring break, and from this, she concluded that F.M. was not at risk of substantial regression over the summer break. (Doc. 13-4, p. 180). Thus, Ms. Davis's judgment was grounded in her observations of F.M.'s performance after two breaks, albeit relatively brief breaks, in the schoolyear. Similarly, Ms. Waddail indicated that she saw no signs of regression in F.M.'s performance throughout the schoolyear and that this was true of F.M.'s performance after spring break. (Doc. 13-5, pp. 35-36).

Plaintiffs point to the fact that F.M. was not promoted to the second grade, but the record demonstrates that F.M.'s failure to advance to the second grade would not necessarily have qualified her for ESY. (Doc. 13-5, p. 33; Doc. 13-10, p. 149). This is because Madison City does not use ESY as an enrichment program

or a means of promoting a student who is unprepared for the next grade. Instead, Madison City uses ESY to prevent students with IEPs from regressing with respect to the benchmarks and annual goals contained in their programs. (Doc. 13-5, p. 33; Doc. 13-10, p. 149). F.M.'s teachers did not believe that she needed ESY because she was in fact progressing on her IEP goals.

The objective measures of F.M.'s progress may not indicate a level of progress satisfactory to the plaintiffs, but they do not show regression. F.M.'s work with Ms. Ballard and Ms. Waddail in the early part of the 2015-16 schoolyear indicated that during the summer of 2015, F.M. retained the gains made on her IEP goals. (Doc. 13-4, pp. 112, 116). When F.M. was reassessed shortly after her return to Mill Creek in August 2015, her test results indicated to Ms. Waddail that F.M. had not lost her foundational skills during the summer break. (Doc. 13-4, p. 197).

The plaintiffs contend that the decision to provide ESY cannot be based solely on whether a student has regressed in the past. (Doc. 19, p. 26). But the plaintiffs do not indicate what factors the Court should consider to reach the conclusion that F.M. qualified for ESY. The Court notes that Ms. M. devoted a substantial amount of her time to instructing F.M. during the summer. Her efforts appear to have helped F.M. retain or improve the skills F.M. learned during the school year. "[T]he the ability of the child's parents to provide the educational

structure at home" is one factor courts consider in the ESY analysis. *See Johnson ex rel. Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1027 (10th Cir. 1990). But this factor weighs against the plaintiffs, and the weight of the evidence in the record in this case does not support the conclusion that the absence of ESY also was a denial of FAPE.

### 4. The Timeliness of the School Board's Evaluation of F.M.

The plaintiffs' final procedural argument is that the school board needlessly delayed F.M.'s evaluation for special education. (Doc. 19, pp. 11-12). The hearing officer determined that the school board's evaluation of F.M. complied with the timetables set forth in federal and state regulations. (Doc. 13-1, pp. 58-59). The record supports the hearing officer's conclusion.

"The public agency has sixty (60) calendar days from the date the public agency receives a parent's signed consent for initial evaluation to conduct and complete an initial evaluation. The public agency has thirty (30) calendar days from the completion of the evaluation to determine initial eligibility." Ala. Admin. Code 290-8-9-.02; *see also* 34 C.F.R. 300.301(c). F.M. enrolled at Mill Creek on October 14, 2014. Although Ms. M. previously had spoken with individuals at Mill Creek about the possibility of having F.M. evaluated for special education services, she did not submit a written consent for an evaluation until November 4,

2014.  (Doc. 13-18, p. 24).  The school board promptly processed this request and began evaluating F.M. on November 20, a little over one month after F.M.'s enrollment and less than three weeks after the board obtained Ms. M.'s written consent.  (Doc. 13-18, pp. 16, 22).  The eligibility team completed its evaluations on January 15, 2015 and issued the eligibility determination on January 16, 2015.  (Doc. 13-18, pp. 25, 28).  Therefore, record confirms the hearing officer's conclusion that school board did not delay unreasonably in having F.M. evaluated.

The record indicates that the school board evaluated F.M. in the areas of hearing, speech/language, academic achievement, behavior, and environmental concerns.  (Doc. 13-18, pp. 25-26).  The record also indicates that the eligibility team considered alternative classifications for F.M.'s disability, though these were ultimately ruled out as the primary cause of F.M.'s difficulties.  (Doc. 13-5, pp. 221-24; Doc. 13-18, p. 29).  The behavioral interventions that Mill Creek implemented were responsive to the difficulties that F.M. demonstrated in the classroom.  Although there may have been errors in the process, the record does not indicate that these errors seriously compromised the extent or quality of the interventions and supports that Mill Creek provided to F.M. during the 2014-15 schoolyear.  Therefore, the plaintiffs have not demonstrated that the school board committed procedural violations of the IDEA that denied F.M. a FAPE.  The Court

grants judgment in favor of the school board on the plaintiffs' procedural and behavioral claims.

### b. Whether F.M.'s IEP Was Reasonably Calculated to Provide Her with a FAPE

An IEP must contain a statement of the child's present levels of academic achievement," a description of "how the child's disability affects the child's involvement and progress in the general education curriculum," and a set of annual goals towards which the child will progress under the IEP.  34 C.F.R. §§300.320(a)(1)(i), (a)(2)(i)(A).  The educational program established by an IEP consists of "special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable. . . ."  34 C.F.R. § 300.320(a)(4).  Such a program must be designed to allow the child:

(i)      To advance appropriately toward attaining the annual goals;

(ii)      To be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section, and to participate in extracurricular and other nonacademic activities; and

(iii)      To be educated and participate with other children with disabilities and nondisabled children.

34 C.F.R. § 300.320(a)(4).

The special education services the board provides to a student as part of an IEP must "address the unique needs of the child that result from the child's

disability . . . [t]o ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. §§ 300.39(b)(3)(i), (ii). Thus, the polestar towards which every IEP is directed is the state's general education curriculum; the particular course is chosen in light of the child's needs. *See* Ala. Admin. Code § 290-8-9.05(6)(o) ("Academic goals must be written to general education content standards.").

The language of the federal and state regulations provides limited guidance in assessing whether an IEP is appropriately designed. *See Rowley*, 458 U.S. at 202 ("It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between."). Courts often base their assessment of the IEP's adequacy on the available records of progress that a student has achieved under the plan in question. Since the Supreme Court's decision in *Rowley*, courts have looked to whether there is a record demonstrating that the student has received "some educational benefit" from his or her IEP. *Rowley*, 458 U.S. at 200. But because schools can almost always point to some measure of progress that a student has made under a particular plan, courts have considered what kind of progress sufficiently evidences an adequate educational benefit. The inquiry is inherently fact-bound. *See, e.g.*, *J.S.K. v. Hendry Cty. Sch. Bd.*, 941 F.2d 1563,

1573, n.4 (11th Cir. 1991) ("That one child in another case might be more or less handicapped can be at best speculation and of little help in determining whether a personalized IEP has provided adequate educational benefit.").

Recently, the Supreme Court in *Endrew F. ex rel. Joseph F. v. Douglas County School District* considered how to quantify the level of student progress or achievement which indicates that a school has provided a substantively adequate IEP.[5]  137 S. Ct. 988.  Although the Supreme Court in *Endrew F.* declined "to elaborate on what 'appropriate' progress will look like from case to case," the Court rejected the proposition that a school provides a FAPE where a student achieves progress that is "merely more than *de minimis*."  In rejecting the "more than *de minimis*" approach adopted by several courts of appeal, the Supreme Court rejected the petitioner's position that an IEP must "aim[] to provide a child with a disability opportunities to achieve academic success, [and] attain self-sufficiency. . . that are substantially equal to the opportunities afforded children without disabilities."  *Endrew F.*, 137 S. Ct. at 1001.  The Supreme Court appeared to endorse the view of several courts of appeal that a school does not have to maximize a student's potential to provide that student with a FAPE.  *See, e.g.*, *J.S.K.*, 941 F.2d at 1573.

---

[5] The Supreme Court rendered its decision in *Endrew F.* on March 22, 2017.  Thus, this authority was not available to the hearing officer when he entered his decision on February 17, 2016. (Doc. 13-1, p. 62).  The plaintiffs brought the decision to the Court's attention in a "Notice of Supplemental Authority."  (Doc. 21).

As in *Rowley*, the Supreme Court in *Endrew F.* charted a middle course and counseled that a substantively adequate IEP should be appropriately ambitious in light of a student's circumstance such that the student has "the chance to meet challenging objectives." *Endrew F.*, 137 S. Ct. at 1000–01. Therefore, this Court must attempt to gauge whether F.M.'s IEP was designed to challenge her and "to enable her to make progress appropriate in light of [her] circumstances." *Endrew F.*, 137 S.Ct. at 999. Because "crafting an appropriate program of education requires a prospective judgment by school officials," the Court cannot evaluate whether an IEP is reasonably calculated to provide FAPE solely in terms of what a student actually achieves. Instead, the Court must determine whether the goals and benchmarks designated in the plan were "appropriately ambitious in light of [the student's] circumstances." *Endrew*, 137 S.Ct. at 999–1000.

F.M.'s IEP targets four areas for improvement: articulation, behavior, math, and fluency (reading). (Doc. 13-14, pp. 16-19). Each section of the IEP contains the requisite statement of F.M.'s present level of achievement as well as annual goals broken down into intermediate benchmarks. *Id.* Apart from the behavior-related arguments discussed above, the plaintiffs argue that the annual goal and intermediate benchmarks in the area of fluency (reading) demonstrate that the IEP was not reasonably calculated to provide F.M. with a FAPE. F.M.'s annual fluency goal states that, by the conclusion of the year-long IEP, she "will read with

sufficient accuracy and fluency to support comprehension by increasing her Fry word recognition and applying grade-level phonics with 80% accuracy in 4 of 5 trials." (Doc. 13-14, p. 19).

Plaintiffs contend that F.M.'s annual reading goal was not sufficiently ambitious because she demonstrated immediate mastery of her first two benchmarks. Plaintiffs also argue that even had F.M. achieved her annual goal, she would not have attained the grade standards necessary for timely advancement to the second grade. (Doc. 17-1, pp. 34-35). Plaintiffs submit that F.M.'s minimal progress under the IEP was plainly too little to constitute the educational benefit necessary under *Rowley/Endrew*, thus demonstrating that the IEP was substantively inadequate. (Doc. 17-1, pp. 38-39). The Court does not agree.

The record indicates that F.M.'s academic performance was below grade level when she transferred to Mill Creek in mid-October 2014. (Doc. 13-3, pp. 32-42; Doc. 13-14, pp. 26-30). The discrepancy between F.M.'s performance and first-grade expectations was so apparent that Ms. Davis's first suggestion to Ms. M. was that F.M. be returned to kindergarten for the year. (Doc. 13-14, p. 27). F.M. was not fully integrated into her general first grade classroom. On a weekly basis, she received four and a half hours of instruction outside of her general education classroom in small group sessions with the special education teacher. (Doc. 13-3, p. 67; Doc. 13-4, p. 15). The plaintiffs had informed the IEP team that

F.M. responded to focused attention from teachers. In doing so, the plaintiffs acknowledged that F.M.'s academic success depended on a level of attention that can be provided only outside of the general classroom. (Doc. 13-22, p. 49). Because F.M. was not fully integrated into the general classroom, it is not a given that her IEP goals should have tracked the standards for timely advancement to the second grade, nor is it proper to assume that F.M. should have advanced to the next grade level on the same timetable as her peers. *See Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F. Supp. 2d 1091, 1118 (N.D. Ala. 2013) ("The point of requiring an *Individualized* Education Program is to have the program meet the child's unique needs, not to assume that *all* children in special education are capable of meeting state goals for that grade.") (emphasis original).

The Court notes that F.M. had a limited period of time to achieve any progress under her IEP. Because F.M. transferred to Mill Creek after the schoolyear had begun, and because the school board needed time to evaluate F.M.'s needs and design a plan responsive to those needs, Mill Creek did not implement F.M.'s IEP until February 2015. (Doc. 13-14, p. 13). When the plaintiffs withdrew F.M. from Mill Creek in October 2015, she had not completed her original year-long IEP. (Doc. 13-5, p. 8). Therefore F.M.'s progress under her IEP does not necessarily indicate whether the IEP was adequate.

Under the special education component of the IEP, Ms. Waddail provided a program designed to improve F.M.'s reading skills. Initially, Ms. Waddail worked to help F.M improve her base competency with letters and sounds while incorporating elements of the Specialized Program in Individual Reading Excellence (S.P.I.R.E.). (Doc. 13-4, pp. 72-73, 219-20). F.M. began with the full-fledged S.P.I.R.E. reading program in August of the 2015-16 schoolyear after she achieved progress with basic fluency concepts. (Doc. 13-4, p. 111).[6]

Mill Creek administered STAR assessments to F.M. four times during the 2014-15 schoolyear to assess her progress in the areas covered by her IEP. (Doc. 13-14, pp. 11-12). In F.M.'s problem area of reading, her October 2014 STAR assessment shows that she began at a grade equivalent score of 1.0. (Doc. 13-14, p. 12). By May of 2015, F.M. tested at a 1.1 grade equivalent score; the grade equivalent score necessary for advancement to the second grade is a 1.8. (Doc. 13-14, pp. 10, 12). The progress that F.M. demonstrated by this metric is concededly minimal, but it must be viewed in context. (Doc. 13-2, p. 134). By the time of F.M.'s assessment on May 8, 2015, her IEP had been in place for three months. A

---

[6] The plaintiffs argue that part of the school's failure to address F.M.'s particular needs was the school's use of "Wonders" materials from McGraw Hill in F.M.'s reading instruction. The plaintiffs argue that there is no peer-reviewed research establishing the efficacy of these materials in instructing students with learning disabilities. (Doc. 17-1, p. 36-37). But the plaintiffs concede that these were the instructional materials used in F.M.'s general first grade classroom. *Id.* Because the IDEA seeks to have disabled students taught with their peers according to grade standards whenever possible, the school board's use of the "Wonders" materials in addition to the S.P.I.R.E. program is not a concern.

few weeks after F.M. returned to Mill Creek in August 2015, she improved her STAR reading assessment score to a 1.3. (Doc. 13-4, p. 12). Whether this was chiefly because of Ms. M's concerted efforts to help F.M. during the summer or because of the continued implementation of F.M.'s IEP at Mill Creek, the Court cannot say, but it does represent progress towards the grade equivalent standard of 1.8 that F.M. was expected to meet during the 2015-16 school year.

By other metrics, F.M.'s progress in reading was more concrete. Ms. Davis testified that F.M. made "a lot of progress" on her Fry high frequency words assessment, a test designed to monitor a student's ability to identify certain common words without having to sound them out. (Doc. 13-2, pp. 157-58). F.M. progressed from an 8% score on her first Fry words assessment to a 63% percent on the final assessment that Ms. Davis administered for the 2014-15 school year. (Doc. 13-2, p. 158). On the STAR Early Literacy assessment, a precursor to the STAR Reading assessment, F.M.'s three test results indicate that she progressed from an initial score of 517 to a score of 777, a mark which indicated her readiness for the reading comprehension tasks on the STAR Reading assessment. (Doc. 13-2, pp. 161-63). Thus, the record indicates that in this limited three-month window of time, F.M. was making quantifiable gains in the area of reading.

The plaintiffs argue that in assessments given by Ms. Waddail, F.M. demonstrated mastery of her first two IEP reading benchmarks almost

immediately. From this, the plaintiffs argue that the IEP was either insufficiently challenging or otherwise not appropriately tailored to F.M.'s needs. (Doc. 17-1, p. 11). Although the record indicates that F.M. mastered her first reading benchmarks fairly quickly, (Doc. 13-4, pp. 41-42), imperfect calibration of an intermediate step does not make her annual goal deficient.

Ms. Waddail testified that the first benchmarks in area of fluency were based on the basic literacy skills that F.M. had trouble applying in class. (Doc. 13-4, p. 42). Although F.M. had "mastered" her second fluency benchmark by April 2014, Ms. Waddail would occasionally assess F.M. on tasks relevant to this benchmark to monitor isolated areas of continued difficulty for F.M. (Doc. 13-4, p. 195). The record indicates that upon F.M.'s return to school in August 2015, she was only beginning the progress towards her third benchmark while continuing to devote some time to her second benchmark. (Doc. 13-4, pp. 195, 197). Notably, when Ms. Waddail gave F.M. her first S.P.I.R.E. assessment on August 5, 2015, the test results indicated that F.M. should begin at the program's first step with tasks corresponding to her third IEP benchmark in the area of fluency. (Doc. 13-4, pp. 198-199). In August 2015, F.M. was in the fourth month of an IEP that she was to finish in February of 2016. She appears to have completed her second of four bench marks at this time. With two benchmarks still to be covered in six months

or so, it is not clear to the Court that either the benchmarks or the annual goal were insufficiently ambitious in light of F.M.'s circumstances.

Although the plaintiffs direct their arguments largely to the area of reading, F.M.'s IEP covered a broader array of areas. In mathematics, another area covered by the IEP, the record indicates that F.M. improved throughout the 2014-15 school year. F.M.'s progress on her STAR Math assessments was not completely linear. Her initial assessment results in October 2014 put her in the 32nd percentile of first graders. (Doc. 13-14, p. 11). Her final assessment in May 2015, put her in the 43rd percentile. (Doc. 13-14, p. 11). F.M.'s intervening assessments put her in the 48th percentile in December 2014 and only the 4th percentile in March 2015. (Doc. 13-14, p. 11). F.M., however, did make progress along the grade equivalent scale from a 0.6 in October 2014 to a 1.7 in May 2015, just below the designated grade equivalent of 1.8 necessary for her to advance to the second grade. (Doc. 13-2, pp. 132-33; Doc. 13-14, p. 11). Ms. Davis characterized this improvement as "a huge gain." (Doc. 13-2, p. 168). A comparison of F.M's three available report cards also indicates general, though not uniform, improvement in mathematics, as more marks designating mastery of math-related concepts appear at each grading interval. (Doc. 13-14, pp. 7-8; Doc. 13-18, pp. 11-12).

Finally, F.M.'s reports cards also indicate that, during the 2014-15 school year, she achieved passing marks in science, social studies, PE, technology skills, and music. (Doc. 13-2, pp. 121-122; Doc. 13-14, pp. 8-9).

In light of this mixed picture, the Court is unable to find that the plaintiffs have carried their burden of showing that record establishes that F.M.'s IEP was not reasonably calculated to provide her with a FAPE.

## IV. CONCLUSION

For the reasons stated above, the Court concludes that the administrative hearing officer's decision in favor of the school board was supported by the record. The plaintiffs have not demonstrated that the school board committed a procedural violation of the IDEA that denied F.M. a FAPE for the 2014-15 schoolyear. The plaintiffs also have not marshalled evidence that would allow the Court to conclude that the IEP was not reasonably calculated to provide F.M. with a FAPE. Therefore, the Court denies the plaintiffs' motion for judgment on the record and grants judgment in favor of the defendant school board.

**DONE** and **ORDERED** this March 30, 2018.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE